

May 6, 2026

**SENT VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Bureau of Street Services                          Office of the City Clerk
1149 S. Broadway, 4th Floor                        200 North Spring St.
Los Angeles, CA 90015                              Room 395, City Hall
                                                   Los Angeles, CA 90012

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

Dear City of Los Angeles Bureau of Street Services,

I write on behalf of Los Angeles Waterkeeper ("LA Waterkeeper") regarding violations of the Clean Water Act[1] ("CWA" or "the Act") and California's General Industrial Storm Water Permit[2] ("General Permit") at the industrial facilities ("Facilities") identified in TABLE 1 below. This letter[3] ("Notice Letter") is being sent to you as the responsible owner/operator of one or more of the Facilities or as the registered agent for City of Los Angeles Bureau of Street Services ("the City" or "LAStreet"). LA Waterkeeper intends to file a civil enforcement action against the City for violations of the Act and General Permit sixty (60) days form the date this Notice Letter is received. The civil action will: (1) allege ongoing violations of the Act and General Permit at the Facilities, including but not limited to the unlawful discharge of storm water contaminated with pollutants to the Los Angeles River (tributaries, Reaches 1 and 2, and estuary), the Tujunga Wash, and connected coastal waters of the Pacific Ocean, (collectively the "Receiving Waters); (2) request judicial imposition of injunctive relief and civil penalties; and (3) request reasonable fee and cost reimbursement.

This Notice Letter complies with federal regulations and contains sufficient information to

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*

[2] National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated with Industrial Activity, Order No. CAS000001, ORDER WQ 2014-0057-DWQ, AS AMENDED BY ORDER WQ 2015-0122-DWQ and ORDER WQ 2018-0028-DWQ

[3] Section 505(b) of the CWA requires that sixty (60) days prior to initiating a civil action under Section 505(a), 33 U.S.C. § 1365(a), a citizen must give notice of their intention to file suit to the alleged violator, the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2.

permit the City to understand and ameliorate alleged violations. *See* 40 C.F.R. § 135.3. The Notice Letter includes, without limitation: (1) citations to the Act's relevant mandates, and descriptions of the statutory permitting scheme; (2) citations to specific provisions in the General Permit that have been and are being violated at the Facilities; (3) a description of industrial activities at the Facilities, including the identification of potential pollutant sources; (4) descriptions of discharges of storm water into jurisdictional waters without required pollution prevention planning, pollution control measures, reporting, and remedial activities; and (5) specific date(s) of storm water discharge violations, and date ranges during which non-discharge violations took place.

<u>TABLE 1</u>

| Asphalt Plant 1<br>WDID 4 19I029536<br>2484 East Olympic Blvd.<br>Los Angeles, CA 90021 | Asphalt Plant 2<br>WDID 4 19I001895<br>12251 Sherman Way<br>North Hollywood, CA 91605 | Recycled Aggregate Yard<br>Unpermitted<br>2601 E. 25th St.<br>Los Angeles, CA 90058 |
|---|---|---|

The Act is a strict liability statute and "there are no exceptions for minimal violations or mistakes." *Cal. Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1151 (E.D. Cal. 2016); *see also Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1491 (9th Cir. 1987). To establish liability here, LA Waterkeeper must only establish that the Facilities have discharged pollutants to navigable waters from point sources in violation of, or without authorization under, an NPDES permit. *See Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.,* 13 F.3d 305, 308 (9th Cir. 1993), *cert. denied*, 513 U.S. 873 (1994). There are two varieties of NPDES permits: general and individual. 33 U.S.C. § 1342(p). In California, industrial sites discharging pollutants to federal waters must obtain coverage under the General Permit, or apply for an individual permit, and comply with permit terms and conditions. 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* General Permit, § I.A.1, 12. The City is liable for ongoing violations of the Act at each of the Facilities as a consequence of its failure to comply with the terms and conditions of an NPDES permit, including without limitation the General Permit's technology-based Effluent Limitations, water quality-based Receiving Water Limitations, storm water pollution prevention planning requirements, and monitoring and reporting mandates. Each violation of any term or condition of the General Permit is an independent violation of the Act. The City is liable under the CWA for each violation of the General Permit since May 6, 2021. 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

## I.    BACKGROUND

### A.  Los Angeles Waterkeeper

LA Waterkeeper is a non-profit public benefit corporation founded in 1993 and organized under the laws of California. LA Waterkeeper is dedicated to the preservation and defense of the rivers, creeks, and coastal waters of Los Angeles County. The organization works to achieve these goals through education, outreach, organizing litigation, and advocacy.

When necessary to achieve its objectives, LA Waterkeeper initiates citizen enforcement actions under the Act on behalf of itself and its members who live, work, and recreate in and around Los Angeles County, and who use and enjoy the Receiving Waters and nearby beaches. LA Waterkeeper members use these and connected waterways, beaches, and ocean waters to research, educate, fish, surf, swim, sail, SCUBA dive, kayak, bird watch, and recreate. Unlawful discharges of pollutants from the Facilities impair the ability of LA Waterkeeper members to use and enjoy these waters.

As explained in this Notice Letter and its appendices, the Facilities have discharged and continue to discharge pollutants into jurisdictional waters in violation of the CWA and the General Permit. The interests of LA Waterkeeper members, therefore, have been, are being, and will continue to be adversely affected by LAStreet's failure to comply with the Act and the General Permit.

### B.  Owner and/or Operator of the Facilities

The City is responsible for building, maintaining, and repairing roadways, bridges, tunnels, sidewalks, pedestrian subways, and related infrastructure across the City of Los Angeles. The City and/or LAStreet owns and/or operates each of the Facilities. The City produces its own asphalt at Asphalt Plant 1 ("Plant 1") and Asphalt Plant 2 ("Plant 2"). The City also operates the Recycled Aggregate Yard, where it stores and processes asphalt removed and/or used during maintenance and resurfacing activities.

### C.  The Facilities' Storm Water Permit Coverage

1.  Asphalt Plant 1

The City has been operating Plant 1 since at least 1992. Between 1992 and 2017, Plant 1 conducted operations under WDID 4 19I000814. As part of a rebuilding and modernization project for Plant 1, the City filed a Notice of Termination in 2016. Between December 5, 2016 and November 9, 2021, the City operated Plant 1 without NPDES permit authorization for storm water discharges from the site. After being identified as an unpermitted discharger in August 2021 by the Los Angeles Regional Water Quality Control Board ("Regional Board"), the City re-enrolled the site in the General Permit and was assigned WDID 4 19I029536 on or after November 9, 2021.

Plant 1 is a 1.9-acre lot located in an area zoned for heavy industrial use, and contains an unhoused continuous drum mix asphalt plant and equipment, office building, fuel station, reclaimed asphalt storage pile, truck spray area, equipment parking area, vehicle, equipment, and machinery storage, and underground fuel tanks.

Industrial facilities that discharge storm water "associated with industrial activity" are required to apply for coverage under an NPDES permit by submitting a Notice of Intent ("NOI") form to the State Water Resources Control Board ("State Board"). After agency approval, permittees enroll in and obtain coverage under the General Permit. *See* 40 C.F.R. § 122.26(A)(1)(ii); General Permit, § I.A.12. Categories of facilities considered to be engaging in industrial activity include, without limitation, those defined in C.F.R. Chapter I, Subchapter N ("Subchapter N"), including

3

Part 443 (asphalt point sources), and facilities assigned specified Standard Industrial
Classification ("SIC") codes, including 2951 (asphalt paving mixtures and blocks). *See* 40 C.F.R.
§ 122.26(B)(14)(i)-(ii).

Plant 1's industrial activities fall within the definitions of Subchapter N, Part 443, and SIC codes
2951 (Asphalt Paving Mixtures and Blocks), 4212 (Local Trucking Without Storage), and 4214
(Local Trucking With Storage). To lawfully discharge storm water to the Receiving Waters,
therefore, the City must obtain coverage for the Facility under, and comply with, the General
Permit. *See* General Permit, Attachment A, ¶¶ 1-2 (Facilities covered by National Pollutant
Discharge Elimination System [] General Permit for Storm Water Discharges Associated with
Industrial Activities[]); *see also* General Permit, Fact Sheet § II.A.1 ("[A] Discharger may have
more than one primary industrial activity occurring at a facility.")

2.    Asphalt Plant 2

Asphalt Plant 2 has been operating since at least 1989 under WDID 4 19I001895. LA
Waterkeeper's investigation indicates that, while the City is not currently manufacturing asphalt
at Plant 2, the site continues to be used for industrial activities, including for material storage and
processing, and machinery, vehicles, and equipment ("industrial equipment") storage. Asphalt
Plant 2 is approximately 1.9 acres and located in an area zoned for heavy industrial use. The site
contains an unhoused asphalt batch plant and equipment, office, building, garages, recycled
asphalt bins, trash bins, a tool room, a locker room, above ground asphalt storage vats, aggregate
material bunkers, an above ground SS1H asphalt emulsion tank[4], a hazardous waste storage shed,
a metal spray platform, and a gas fueling island. Plant 2 2025 SWPPP, § 2.2.

Industrial facilities that discharge storm water "associated with industrial activity" are required to
apply for coverage under an NPDES permit by submitting a NOI form to the State Board to
enroll in and obtain coverage under the General Permit of an individual NPDES Permit. *See* 40
C.F.R. § 122.26(A)(1)(ii); General Permit, § I.A.12. Categories of facilities considered to be
engaging in industrial activity include, without limitation, those defined in C.F.R. Chapter I,
Subchapter N, Part 443, and facilities assigned specified SIC codes, including 2951 (Asphalt
Paving Mixtures and Blocks), 4212 (Local Trucking Without Storage), and 4214 (Local
Trucking With Storage). *See* 40 C.F.R. § 122/26(B)(14)(i)-(ii).

Asphalt Plant 2's industrial activities fall within the definitions of Subchapter N, Part 443, and
SIC codes 2951, 4212, and 4214. To lawfully discharge storm water to the Receiving Waters,
therefore, the City must obtain coverage for the Facility under, and comply with, the General
Permit. *See* General Permit, Attachment A, ¶¶ 1-2 (Facilities covered by National Pollutant
Discharge Elimination System [] General Permit for Storm Water Discharges Associated with
Industrial Activities[]); *see also* General Permit, Fact Sheet § II.A.1 ("[A] Discharger may have
more than one primary industrial activity occurring at a facility.")

---

[4] The designation "SS1H" is not described by the City in any publicly available submission on
SMARTS. Based on LA Waterkeeper's own review of other publicly available technical
information, SS-1H is an asphalt emulsion product comprised of asphalt, water, emulsifiers, and
surfactants.

### 3.    Recycled Aggregate Yard

The City has been operating the Recycled Aggregate Yard since at least 1994. Industrial activities undertaken by the City at the Recycled Aggregate Yard fall within, at a minimum, the following SIC code designations—5093 (Scrap and Waste Materials), 4212 (Local Trucking Without Storage), and 4214 (Local Trucking With Storage). According to publicly available information, including the State Board's online database for NPDES program compliance filings (Storm Water Multiple Application and Report Tracking System ("SMARTS"), the City has never filed a NOI form for coverage for the Recycled Aggregate Yard under the General Permit or otherwise received NPDES authorization for the discharge of pollutants.

The Recycled Aggregate Yard's discharges containing pollutants to waters of the United States without NPDES permit authorization are violations of the Act's central prohibition. U.S.C. § 1311(a); *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1066 (9th Cir. 2011) (the Act "is founded on the basic premise that a discharge of pollutants without a permit is unlawful and that discharges not in compliance with the limitations and conditions of a permit are unlawful.").

### D.   The Facilities' Industrial Activities and Pollutant Sources

### 1.    Asphalt Plant 1

Plant 1 is a continuous drum mix asphalt facility. Plant 1 2025 SWPPP, § 2.3. "Virgin aggregate and recycled asphalt product (RAP) is introduced to the Double Barrel dryer drum mixer via conveyor belt... The dried mixture of virgin aggregate and RAP is then discharged from the Double Barrel mixing chamber into the pugmill. Liquid asphalt cement (AC) is injected into the pugmill and blended with the dried materials to produce the final paving mixture. The finished product is placed on drag conveyors and transported to the Hot Mix Asphalt Storage Silos. The mixed asphalt is then loaded into trucks in the silo tunnel." *Id.*

Plant 1 reports routinely generating waste consisting of asphalt emulsion, diesel, gasoline, motor oil, and grease. *Id.* Industrial activities conducted at Plant 1 include, but are not limited to fueling, storage of hazardous materials, vehicle traffic, heavy machinery operation, asphalt production, cleaning, delivering, loading, unloading, shipping and receiving, and spray down of trucks.

Plant 1's industrial operations result in the accumulation of industrial material throughout Plant 1's outdoor areas, on roofs, on public streets, and in neighboring properties (including residents). During storm events, these accumulations of dust and particulate are discharged as dissolved and suspended pollutants in storm water to three (3) discharge points, and flow into the Los Angeles County municipal separate storm sewer system ("MS4"), which conveys the pollutants to the Receiving Waters.

//
//

5

### 2. Asphalt Plant 2

Plant 2 is an asphalt plant. At the site, "[a]ggregate is transported to a direct flame gas-fired rotary dryer... The aggregate is elevated to [a] batch tower for material classification and then enters the mixing operation where hot asphalt is added. The finished product is placed on conveyor belts and transported to [] silos." *Id.*, § 2.3. The asphalt is then loaded onto trucks for transport. *Id.*

Plant 2 reports routinely generating waste consisting of SS1H asphalt emulsion, diesel, and water. *Id.* Industrial activities conducted at Plant 2 include, but are not limited to: fueling, storage of hazardous materials, vehicle traffic, heavy machinery operation, asphalt production, cleaning, delivering, loading, unloading, shipping, and spray down of trucks.

Plant 2's industrial operations result in the accumulation of material throughout Plant 2's outdoor areas, on roofs, on public streets, and in neighboring properties (including residences approximately 800 feet from Plant 2). During storm events, these accumulations of dust and particulate are discharged as dissolved and suspended pollutants in storm water to at least four (4) discharge points, and flow into the Los Angeles County MS4, which conveys the pollutants to the Receiving Waters.

### 3. Recycled Aggregate Yard

Based on publicly available information, the City utilizes the Recycled Aggregate Yard as surplus storage and operational space for recycled asphalt product generated at Plant 2. Asphalt is stored in large uncovered piles at the Recycled Aggregate Yard and is processed with crushers and screeners. The site also contains a concrete pad, a storage room with several containers of coolant, grease, and hydraulic oil, and an approximately 25-foot-tall steel canopy with metal supports. Industrial equipment and machinery operate and are stored at the site.

LA Waterkeeper's analysis of storm water discharged from the Recycled Aggregate Yard to the Los Angeles River demonstrates that the Recycled Aggregate Yard's storm water discharges contain the following pollutants: oil and grease, total suspended solids, aluminum, copper, iron, lead, and zinc. The Recycled Aggregate Yard's industrial operations result in the accumulation of material throughout the Yard's outdoor areas, on roofs, on public streets, and in neighboring properties (including nearby residences). Based on LA Waterkeeper's review of satellite maps, there are three (3) driveways to and from the Recycled Aggregate Yard, each of which is likely to be a discharge point. During storm events, as reflected by LA Waterkeeper's sampling, accumulations of dust and particulate from the site are discharged as dissolved and suspended pollutants in storm water to one or more discharge points, and flow directly into the Los Angeles River[5] or into the Los Angeles County MS4, which conveys the pollutants to the Los Angeles River.

//
//

---

[5] The Recycled Aggregate Plant is approximately 450 feet from the Los Angeles River.

6

### E.  Storm Water Pollution

With every significant rainfall event, millions of gallons of polluted storm water originating form industrial operations like those occurring at the Facilities flow into storm drains, creeks, rivers, estuaries, coastal waters, and the Pacific Ocean. The discharge of pollutants from industrial facilities contribute to the impairment of downstream waters, which can harm the aquatic environment and public health. These contaminated discharges can and must be controlled as the CWA requires for ecosystems to regain their health and to protect public health.

Each industrial process at each of the Facilities has the potential to generate pollutants that will contaminate its storm water discharges. According to the U.S. EPA, polluted storm water discharges from SIC 2951, such as those conducted at the Facilities, can contain total suspended solids, total dissolved solids, biochemical oxygen demand, chemical oxygen demand, oil and grease, benzene, methylene blue active substances, metals, pH, petroleum or synthetic-based stocks and various additives, gas/diesel fuel, fuel additives, oil/lubricants, heavy metals, brake fluids, transmission fluids, chlorinated solvents, and arsenic.[6] Many of these pollutants are on the list of chemicals published by the State of California that are known to cause cancer, birth defects and/or developmental or reproductive harm. Cal. Health & Safety Code §§ 25249.5-25249.14. During storm events, polluted storm water from the Facilities discharge directly to the Receiving Waters or to the Los Angeles County MS4, which then conveys storm water and pollutants to the Receiving Waters.

These Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied wildlife, these waters are still essential habitat for dozens of fish and bird species as well as invertebrate species. The Regional Board identifies potential and existing Beneficial Uses of the Los Angeles River in its "Water Quality Control Plan—Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura County" ("Basin Plan"). The potential and existing uses include but are not limited to: Municipal and Domestic Supply, Industrial Service Supply, Ground Water Recharge, Warm Freshwater Habitat, and Wildlife Habitat. *See* Basin Plan, Table 2-1. Storm Water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the environmental, social, and economic values of the Receiving Waters.

The 2024 California Integrated Report (Clean Water Act Section 303(d) List/305(b) Report) lists the Los Angeles River as impaired for, among other pollutants, indicator bacteria, oil and grease, zinc, ammonia, copper, lead, nutrients, and trash.[7] The City's discharges of impairing pollutants to the Los Angeles River cause or contribute to that impairment.

Discharges of polluted storm water and non-storm water to local waterways/bodies pose carcinogenic, developmental, and reproductive toxicity threats to the public (including LA

---

[6] See https://www.epa.gov/sites/default/files/2016-03/documents/sector_d_asphalt_0.pdf.

[7] The Los Angeles River Reach 1, downstream of Reach 2 is impaired for, among other pollutants: copper, bacteria, lead, zinc and zinc. The Los Angeles River Estuary, also downstream of Reach 2, is impaired for, among other pollutants: copper, bacteria, zinc, and PCBs.

Waterkeeper members), adversely affect the aquatic environment, and impair the tourist economy on which much of the region depends. The Facilities' unlawful discharges of polluted storm water degrade the quality of the Receiving Waters and poses risks to human health and aquatic life, which negatively impacts LA Waterkeeper's members' use and enjoyment of the Receiving Waters.

## II.    THE CLEAN WATER ACT AND INDUSTRIAL STORM WATER REGULATION

### A.  The NPDES Permit Program

The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate the discharge of pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the Act prohibits the discharge of any pollutant into waters of the United States unless the discharger complies with other enumerated sections of the Act, including the prohibition on discharges not authorized by, or in violation of, the terms of a NPDES permit. 33 U.S.C. §§ 1311, 1342(b); *see also* General Permit, § I.A.12. The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. *Id.*; *see also* 40 C.F.R. § 122.26(c)(1).

Section 402(p) of the Act establishes a framework for regulating industrial storm water discharges under federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p). To lawfully discharge storm water in California, therefore, industrial dischargers that discharge storm water to waters of the United States must obtain coverage under the General Permit, or an individual permit, and comply with all permit terms and conditions. 33 U.S.C. § 1311(a); *see also* General Permit, § I.A.1, 12; 40 C.F.R. § 122.26(c)(1).

Compliance with the General Permit constitutes compliance with the Act for purposes of storm water discharges associated with industrial activity. 33 U.S.C. §§ 1311(b)(2). Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code[.]" General Permit, § XXI.A. An industrial permittee that fails to comply with the terms and conditions of the General Permit, therefore, is liable for violations of the Act. *Nw Envtl. Advocates v. City of Portland*, 56 F.3d 979, 988, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce all permit conditions."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural."); *see also* General Permit, § I.A.8 ("This General Permit authorizes discharges of industrial storm water [...] so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.").

### B.  California's General Industrial Storm Water Permit

To lawfully discharge pollutants to waters of the United States in California, persons who discharge storm water associated with industrial activity must enroll in, and comply with, all terms and conditions of the General Permit. 33 U.S.C. §§ 1311(a), 1342(b); 40 C.F.R. §

8

122.26(c)(1).

The General Permit requires that a discharger file an NOI form with the State Board prior to discharging storm water associated with industrial activity. Once enrolled, the General Permit requires that permittees consistently engage in four independent, but mutually-reinforcing actions: 1) executive planning and facility-specific pollution control design; 2) on-the-ground implementation of pollution control technologies; 3) monitoring storm water discharges for evidence of pollution; and 4) annual evaluation of the effectiveness of pollution control strategies, including corrective action when necessary. The General Permit contains the following specific provisions and mandates:

1.   Technology-Based Effluent Limitations

The General Permit requires all dischargers to comply with technology-based pollution prevention standards. 33 U.S.C. § 1311(b); General Permit, § V.A ("Effluent Limitations"). Permittees comply with these technology-based standards by reducing or preventing pollutants associated with industrial activity in storm water discharges through the implementation of pollution controls that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants (collectively "BAT/BACT"). *See* General Permit, § V.A. The BAT/BCT requirements set the floor for storm water pollution prevention, and apply to every permittee regardless of the quality of water to which the facility discharges. *See* General Permit, § I.D.31.

To comply with the BAT/BCT standard, all dischargers must implement pollution control measures—called Best Management Practices ("BMPs")—that reduce or prevent pollution in storm water discharges in a manner that reflects best industry practice. Permittees must all develop and implement minimum BMPs identified in the General Permit, as well as any advanced BMPs necessary to comply with the BAT/BCT standard. General Permit § I.D.33 ("[T]his General Permit requires Dischargers to implement minimum BMPs and applicable advanced BMPs as defined in Section X.H (collectively, BMPs) to comply with the requirements of this General Permit."); *see also* General Permit, Fact Sheet § II.I.2.o ("Failure to implement all of the minimum BMPs to the extent feasible is a violation of this General Permit" (Section X.H.1.) Dischargers must justify any determination that it is infeasible to implement a minimum BMP in the SWPPP (Section X.H.4.b). Failure to implement advanced BMPs necessary to achieve compliance with either the technology or water quality standards requirements in this General Permit is a violation of this General Permit.").

For facilities that are unable to implement BMPs preventing storm water discharges, the U.S. EPA has developed a set of benchmark pollutant concentrations ("U.S. EPA Benchmarks") that are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with the statutory BAT/BCT standard expressed in the General Permit's technology-based effluent limitations. *See Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988) (holding a permittee's self-reported storm water monitoring data is equivalent to an admission in NPDES enforcement actions). U.S. EPA Benchmarks applicable to the Facilities' storm water discharges over the last five (5) years include, without limitation, those summarized in TABLE 2.

9

TABLE 2
U.S. EPA BENCHMARKS FOR DISCHARGES TO FRESHWATER

| Pollutant | 2015 Benchmark | 2021 Benchmark |
|---|---|---|
| total suspended solids | 100 mg/L | 100 mg/L |
| biochemical oxygen demand | 30 mg/L | 30 mg/L |
| chemical oxygen demand | 120 mg/L | 120 mg/L |
| aluminum | 0.75 mg/L | 1.1 mg/L |
| copper | 0.014 mg/L | 0.00519 mg/L |
| zinc | 0.12 mg/L | 0.12 mg/L |
| pH | 6.0 – 9.0 s.u. | 6.0 – 9.0 s.u. |
| arsenic | 0.15 mg/L | 0.15 mg/L |
| iron | 1.0 mg/L | n/a |
| magnesium | 0.064 mg/L | n/a |
| antimony | 0.64 mg/L | 0.64 mg/L |
| mercury | 0.0014 mg/L | 0.0014 mg/L |
| nickel | 0.47 mg/L | 0.47 mg/L |
| silver | 0.0032 mg/L | 0.0032 mg/L |
| lead | 0.082 mg/L | 0.082 mg/L |
| cadmium | 0.0021 mg/L | 0.0018 mg/L |

2.   Water Quality-Based Effluent Limitations

In addition to complying with the General Permit's technology-based Effluent Limitations, permittees are required to comply with "any more stringent [water quality-based effluent limitations] necessary for receiving waters to meet applicable water quality standards." General Permit, § I.D.31. The General Permit's water quality-based effluent limitations, referred to as Receiving Water Limitations, are specifically intended to protect beneficial uses of waters receiving polluted storm water discharges. Unlike the General Permit's technology-based mandate which applies uniformly to all permittees, water quality-based effluent limitations may vary depending on the status of surface waters receiving a given facility's storm water discharge. The General Permit contains three Receiving Water Limitations. General Permit, § VIA.A-C.

The first Receiving Water Limitation prohibits discharges of storm water associated with industrial activity that causes or contributes to an exceedance of any applicable water quality standards ("WQSs"). General Permit, § VI.A; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999) (holding that industrial storm water discharges must strictly comply with WQSs). WQSs applicable to the Facilities' discharges include without limitation:

a.   The numeric aquatic life and human health criteria set out in the California Toxics Rule ("CTR") applicable to all surface waters in the state for which a more specific criteria, e.g., a Total Maximum Daily Load ("TMDL"), has not been set (40 C.F.R. 131.38; *see also* 65 Fed. Reg. 31712 (May 18, 2000)) (*see* TABLE 3);

b.   Interim or final waste load allocations derived from the TMDLs that were incorporated into the General Permit in 2018 (General Permit, Attachment E);

10

c. All numeric objectives contained in or amended into the Water Quality Control Plan—Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura County ("Basin Plan"); and

d. All narrative objectives contained in or amended into the Basin Plan (*see e.g.*, "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan at 3-38).

The General Permit's second Receiving Water Limitation prohibit discharges of storm water that adversely affect human health or the environment (General Permit, § VI.B). The General Permit's third Receiving Water Limitation prohibits discharges of storm water that contain pollutants in quantities that threaten to cause pollution or a public nuisance (General Permit, § VI.C).

TABLE 3

CTR "END-OF-PIPE" LIMITS APPLICABLE TO FACILITIES' DISCHARGES

| Pollutant | Criterion Maximum Concentration (Freshwater) |
|---|---|
| arsenic | 0.34 mg/L |
| cadmium | 0.0043 mg/L |
| copper | 0.013 mg/L |
| lead | 0.065 mg/L |
| nickel | 0.47 mg/L |
| zinc | 0.12 mg/L |

Permittees are required to complete Water Quality Based Corrective Actions when industrial storm water discharges contain pollutant concentrations that violate Receiving Water Limitations. General Permit, § XX.B. Water Quality Based Corrective Actions include without limitation: an evaluation of pollutant sources and BMP implementation; assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and the certification of all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's SWPPP. *See* General Permit, § CC.B.1.a-c; *see also* General Permit, Fact Sheet II.E.1 ("Failure to comply with these additional Water Quality Based Corrective Action requirements is a violation of this General Permit.") The Water Quality Based Corrective Action process is intended to support permittees' future compliance with Receiving Water Limitations. Compliance with the Water Quality Based Corrective Actions, however, is an independent mandate and does not excuse or otherwise impact a permittee's liability for the underlying violations of any Receiving Water Limitations.

3. Discharge Prohibitions

In addition to technology- and water quality-based effluent limitations, the General Permit contains Discharge Prohibitions. General Permit, § III.A-F. The General Permit prohibits the discharges of liquids or materials other than stormwater, either directly or indirectly to waters of the United States. General Permit § III.B. The General Permit further prohibits discharges that violate any discharge prohibitions contained in the Basin Plan, or statewide water quality control

plans and policies. General Permit, § III.D.

### 4.    Total Maximum Daily Load Requirements

Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan, e.g., water contact recreation, cold water habitat) due to instream exceedances of a water quality standard are designated as impaired water bodies pursuant to section 303(d) of the Act and placed on the "303(d) List." 33 U.S.C. § 1313(d). Once placed on the 303(d) List, the CWA requires that U.S. EPA or the state prepare a TMDL designed to restore the water quality in a waterbody or segment to support designated beneficial uses. 33 U.S.C. § 1313. A TMDL specifies the maximum amount of a pollutant that a waterbody or segment can receive and still meet water quality standards and then allocates pollutant loadings to point and non-point sources, as well as waste load allocations and load allocations, respectively.

The General Permit must contain "effluent limits [that] are consistent with the assumptions and requirements of any available waste load allocation for the discharge." 40 C.F.R. § 122.44(d)(1)(vii)(B); *see also* General Permit Fact Sheet II.F.1. In 2018, the State Board re-opened the General Permit "to amend Attachment E [and] the Fact Sheet [to incorporate enforceable] TMDL-specific [] requirements." General Permit § I.F.42; *see also* General Permit Fact Sheet § II.F.6.h.iv. The amendment includes TMDL-based numeric and narrative standards applicable to the Receiving Waters.

The Los Angeles River Metals TMDL and the Los Angeles River Nitrogen TMDL are intended to "protect [] against acute impacts to beneficial uses []" and applies to the Los Angeles River and its tributaries, including the Tujunga Wash. General Permit, Fact Sheet § II.F; General Permit, Attachment E.

Starting on July 1, 2020, storm water discharges to the Facilities' Receiving Waters were required to meet instantaneous maximum TMDL Numeric Effluent Limitations ("NELs") for cadmium, copper, lead, zinc, nitrate, nitrite, and nitrate + nitrite (*see* Table X). General Permit, Attachment C at 5 ("An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value... An exceedance of an NEL is a violation of this General Permit.").

TABLE 4
LA RIVER NELS APPLICABLE TO THE FACILITIES' DISCHARGES

| Impairing Pollutant | NEL | Compliance Date |
|---|---|---|
| cadmium | 0.0031 mg/L | |
| copper | 0.06749 mg/L | |
| lead | 0.094 mg/L | |
| zinc | 0.159 mg/L | July 1, 2020 |
| nitrate | 8.0 mg/L | |
| nitrite | 1.0 mg/L | |
| nitrate + nitrite | 8.0 mg/L | |

12

### 5.    Numeric Action Levels and Exceedance Response Actions

The General Permit contains a set of requirements in a section titled Exceedance Response Actions ("ERAs"). General Permit, § XII. A permittee must complete ERAs when sampling data demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs").[8] NALs are derived from the U.S. EPA Benchmarks. A NAL exceedance operates as a signal to owners/operators, state agencies, and the public that a permittee's BMPs are patently deficient, and therefore immediate remedial actions (i.e., ERA procedures) are required. General Permit, § XII.A. However, "[t]he NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives. NAL... exceedances defined in this General Permit are not, in and of themselves, violations of the General Permit." General Permit, § I.N.77. The exceedance of an NAL triggers reporting requirements. General Permit, § XII.

The General Permit requires permittees to develop and implement ERAs whenever an NAL exceedance occurs during a Reporting Year. The first time storm water monitoring data demonstrate an NAL exceedance, a permittee's compliance status changes from Baseline to Level 1. At Level 1 status, permittees are required to evaluate and revise, as necessary, its BMPs with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP") and submit a report prepared by the QISP. Specifically, permittees will enter Level 1 status on July 1 following the Reporting Year in which the NAL exceedance occurred and must: (1) conduct an evaluation of pollutant controls by October 1; and (2) submit the Level 1 report by January 1. General Permit, § XII.C.

The second time a NAL exceedance occurs for the same parameter in a subsequent Reporting Year, a permittee's status changes from Level 1 to Level 2. At Level 2 status, a permittee is required to submit a Level 2 ERA Technical Report prepared by a QISP. Specifically, permittees must prepare a Level 2 ERA Action Plan by January 1. On the next January first, any permittee with Level 2 status must prepare and submit a Level 2 ERA Technical Report that describes and assesses the effectiveness of all BMPs implemented. General Permit, § XII.D.

Carrying out the mandatory corrective action process triggered by entering Level 1 or Level 2 status does not amount to compliance with the General Permit's technology- or water quality-based mandates, which are independent requirements with which all permittees must comply. Even full compliance with the ERA requirements does not excuse past or ongoing violations of the General Permit's pollution prevention mandates.

//

---

[8] An NAL exceedance occurs when the average of all sampling data for a given pollutant from a Reporting Year exceeds the NAL assigned to that pollutant, i.e., if the average concentration from three samples of zinc is 0.52 mg/L, then the facility would have exceeded the zinc NAL of 0.26 mg/L NAL and move from Baseline to Level 1 status for zinc or from Level 1 status to Level 2 status.

13

TABLE 5
NALs (2008 U.S. EPA Benchmarks) Applicable to the Facilities' Discharges

| *Pollutant* | *Annual NAL* |
|---|---|
| oil & grease | 15 mg/L |
| total suspended solids | 100 mg/L |
| aluminum | 0.75 mg/L |
| iron | 1.0 mg/L |
| copper | 0.0332 mg/L |
| lead | 0.262 mg/L |
| zinc | 0.26 mg/L |
| cadmium | 0.0053 mg/L |

6.    The Storm Water Pollution Prevention Plan

The General Permit requires permittees to prepare and implement a SWPPP prior to conducting, and in order to lawfully continue, industrial activities. General Permit, § X. To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015 or upon the commencement of industrial activity. *See* General Permit, § X.B. The general objectives of the SWPPP include, without limitation: (1) the identification and evaluation of sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges; and (2) the development and implementation of site-specific BMPs to reduce or prevent pollutant concentrations in discharges to levels that comply with the General Permit's discharge prohibitions, and the technology- and water quality-based effluent limitations (described above). *See* General Permit, § X.C.

The SWPPP must include, among other items: (1) a description and narrative assessment of all industrial activity, potential sources of pollutants, and potential pollutants; (2) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; (3) a detailed description of the BMPs developed and implemented, as well as a justification for BMPs that are not being implemented; (4) the identification of, and BMPs to eliminate, non-storm water discharges; € the location where significant materials are being shipped, stored, received, and handled; (5) a description of dust and particulate-generating activities; and (6) the identification of individuals and their current responsibilities for developing and implementing the SWPPP. *See* General Permit, §§ X.A-H.

7.    The Monitoring Implementation Plan

Permittees must develop and implement a storm water monitoring and reporting program—called a Monitoring Implementation Plan ("Monitoring Plan")—prior to conducting, and in order to lawfully continue, industrial activities. *See* General Permit, §§ X.I., XI.A-D. The Monitoring Plan must be included in the SWPPP. *See* General Permit, § X.A.8. The objective of the Monitoring Plan is to measure pollutant concentrations in storm water discharges to assess the effectiveness of BMPs developed and implemented at a facility, *i.e.*, compliance with the

14

General Permit's discharge prohibitions, and the technology- and water quality-based effluent limitations (described above). *See* General Permit, Factsheet § II.J.1. A lawful Monitoring Plan ensures that BMPs are effectively reducing and/or eliminating pollutants in a facility's storm water discharges, and must be evaluated and revised whenever appropriate to ensure ongoing compliance with the General Permit. *Id.*

A central feature of the Monitoring Plan is the requirement that permittees collect and analyze samples of storm water discharges. General Permit, § XI.B. Every NPDES permit must include discharge monitoring sufficient to determine compliance with all permit limits. *NRDC v. Cnty. of Los Angeles*, 2013 U.S. App. LEXIS 16416, *36 (9th Cir. 2013) ("[T]he Clean Water Act requires every NPDES permittee to monitor is discharges into the navigable waters of the United States in a manner sufficient to determine whether [its] compliance with the relevant NPDES permit... That is, an NPES permit is unlawful if a permittee is not required to effectively monitor its permit compliance."); *see also* 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(l) ("[E]ach NPDES permit shall include... monitoring requirements... to assure compliance with permit limitations.").

The General Permit requires the collection and analysis of two (2) storm water samples from a qualifying storm event ("QSE") between July 1 and December 31 of each Reporting Year, and two (2) samples from a QSE between January 1 and June 30 of each Reporting Year. General Permit, § XI.B.2. Each sample must be collected within four (4) hours of the start of a discharge, or the start of facility operations if the QSE occurs within the previous 12-hour period. General Permit, § XI.B.5. Generally, samples must be collected at all discharge locations. *Id.*

Permittees must also conduct visual observations at least once a month, and at the same time sample collection occurs at each discharge location. General Permit, § XI.A. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit, § XI.A.2. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit, § XI.A.3.

The General Permit requires permittees to analyze storm water samples for, among other parameters, total suspended solids and oil and grease (§ XI.B.6.a); pH (§ XI.B.6.b.); additional site-specific parameters identified during the pollutant source assessment, *e.g.*, aluminum (§ XI.B.6.c); parameters based on the facility's SIC code, *e.g.*, iron (§ XI.B.6.d); and additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs (§ XI.B.6.e). Permittees must submit all analytical results from a certified laboratory for all samples via SMARTS within thirty (30) days of obtaining the results for each event. General Permit, § XI.B.11.a.

### 8.   The Annual Comprehensive Facility Compliance Evaluation

Permittees must also complete an Annual Comprehensive Facility Compliance Evaluation ("Annual Compliance Evaluation") each reporting year. General Permit, § XV. The goal of the Annual Compliance Evaluation is to ensure and certify compliance with all other substantive and

15

procedural mandates contained in the General Permit. The Annual Compliance Evaluation must include, at a minimum: (i) a review of all sampling, visual observation, and inspection records conducted during the previous year; (ii) an inspection of all areas of industrial activity and associated pollutant sources for evidence of pollutants entering the storm water conveyance system; (iii) an inspection of all drainage areas previously identified as having no exposure to industrial activities; (iv) an inspection of equipment needed to implement BMPs; (v) an inspection of BMPs; (vi) a review and effectiveness assessment of all BMPs to determine if BMPs are properly designed, implemented, and are effective at reducing and preventing pollutants in storm water discharges; and (vii) an assessment of any other factors needed to comply with the requirements of Section XVI.B (i.e. Annual Report Mandates). General Permit, § XV.

### III. VIOLATIONS OF THE CLEAN WATER ACT AND THE GENERAL PERMIT

#### A. Technology-Based Effluent Limitations

##### 1. Asphalt Plant 1 and Asphalt Plant 2

LA Waterkeeper's investigation—including extensive online record research, viewing historic satellite imagery of the Facilities, reviewing every publicly available document via SMARTS, observations during both wet and dry weather of accumulations of material throughout Asphalt Plant 1 and Asphalt Plant 2's outdoor areas and on public streets—confirm that the City has failed to comply with requirement to implement BMPs that achieve BAT/BCT-level pollutant reductions. General Permit § V.A ("Dischargers shall implement BMPs that comply with the BAT/BCT requirements [] to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability."). The City's own storm water sampling data, however limited, establishes failures to implement BMPs sufficient to avoid exceedances of the General Permit Instantaneous Maximum NALs.

LAStreet has failed and continues to fail to implement basic exposure minimization BMPs that are essential to even the most rudimentary pollution prevention effort, including but not limited to the failure to cover waste and scrap materials during rain events. LAStreet has failed to implement minimum BMPs that are required by the General Permit (e.g., good housekeeping, spill and leak prevention), as well as advanced BMPs commonly used at industrial sites with similar pollutant sources (e.g., engineered filtration wattles or other filter media). Past and ongoing failures to implement all minimum BMPs to the extent feasible, and advanced BMPs necessary to achieve BAT/BCT-level pollutant reductions are violations of the General Permit and Act. 33 U.S.C. 1311(a)-(b); General Permit § V.A; *see also* General Permit, Fact Sheet § II.I.2.o. LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

##### 2. Recycled Aggregate Yard

Storm water sampling data collected by LA Waterkeeper confirms that the Recycled Aggregate

16

Yard is discharging heavily polluted stormwater (*see* TABLE 6). The City is liable for violations of the Act's prohibition on unpermitted discharges for each day it operated the Recycled Aggregate Yard without authorization under a NPDES permit for the last five (5) years.

TABLE 6
LA WATERKEEPER SAMPLING AT THE RECYCLED AGGREGATE YARD

| Date | Pollutant | Result | U.S. EPA Benchmark | General Permit NAL | NEL |
|---|---|---|---|---|---|
| March 5, 2025 | oil and grease | 53 mg/L | n/a | 15 mg/L | n/a |
| | total suspended solids | 1000 mg/L | 100 mg/L | 100 mg/L | n/a |
| | aluminum | 26 mg/L | 1.1 mg/L | 0.75 mg/L | n/a |
| | copper | 0.059 mg/L | 0.00519 mg/L | 0.0332 mg/L | 0.067 mg/L |
| | iron | 30 mg/L | n/a | 1.0 mg/L | n/a |
| | lead | 0.057 mg/L | 0.082 mg/L | 0.262 mg/L | 0.094 mg/L |
| | zinc | 0.25 mg/L | 0.12 mg/L | 0.26 mg/L | 0.159 mg/L |

Exceedances of U.S. EPA's Benchmarks indicate that the City has not implemented BMPs that comply with technology-based effluent limitations required under the Act and General Permit. 33 U.S.C. § 1311; General Permit § V.A. LA Waterkeeper's investigation—including observations during both wet and dry weather of accumulations of material throughout the Recycled Aggregate Yard's outdoor areas and on public streets—confirm that the City has failed to implement even minimum required BMPs, *e.g.*, good housekeeping, and is in ongoing violation of BAT/BCT requirements.

Should the Recycled Aggregate Yard obtain Permit coverage during the course of this litigation, based on the City's ongoing violations at Asphalt Plants 1 and 2, LA Waterkeeper alleges and believes that the Recycled Aggregate Yard will continue to violate the Act as well as the General Permit due to insufficient BMP design and implementation necessary to prevent and reduce polluted storm water discharges. LA Waterkeeper intends to include claims for all section 301 and General Permit violations in its enforcement action as information becomes available.

Each day that the City operates without BMPs achieving BAT/BCT-level pollutant reduction is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Accordingly, the City is liable for daily and continuous violations of the Act and General Permit's technology-based effluent limitations since at least May 6, 2021. Civil penalties and injunctive relief are available remedies for these violations. 33 U.S.C. §§ 1311, 1342.

## B.  Receiving Water Limitations

### 1.  Asphalt Plant 1 and Asphalt Plant 2

On information and belief, based on the pollutant sources and absence of sufficient BMPs in the SWPPPs for each facility, discharges of storm water from Plant 1 and Plant 2 contain toxic (*e.g.*,

17

lead, copper) and conventional (*e.g.*, total suspended solids) pollutants in concentrations that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance. These violations occur each time storm water was/is discharged from the Asphalt Plants. *See* General Permit, § IV. LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

2.   Recycled Aggregate Yard

Based on LA Waterkeeper's examination of data and in-person observations at the Recycled Aggregate Yard, the City has violated and continues to violate the General Permit's Receiving Water Limitations. Specifically, storm water sampling data collected by LA Waterkeeper at the Recycled Aggregate on March 5, 2025, indicate that concentrations of zinc exceeded the LA River Metals TMDL NEL. On that basis, the City is liable for causing and contributing to an exceedance of applicable WQSs for each day of significant rainfall from July 1, 2020, when applicable TMDL requirements took effect, to May 6, 2021. Civil penalties and injunctive relief are available for these violations. 33 U.S.C. §§ 1311, 1342.

Discharges from the Facility contain concentrations of oil & grease, total suspended solids, aluminum, copper, iron, and zinc in excess of U.S. EPA Benchmarks/NAL values, and CTR thresholds, respectively, cause and/or contribute to the exceedance of water quality standards for addressing toxicity impairments in the On that basis, the City is liable for ongoing violations of the General Permit's Receiving Water Limitations and of the Act for each day of significant rainfall since May 6, 2021. *See* Appendix 1. Civil penalties and injunctive relief are available remedies for these violations. 33 U.S.C. §§ 1311, 1342. LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

**C.  Discharge Prohibitions**

Based on LA Waterkeeper's examination, the City has failed and continues to fail to comply with the General Permit's Discharge Prohibitions. Specifically, the City discharges storm water in violation of the terms of the General Permit, *e.g.*, discharges material other than storm water, and violates statewide water quality control plans and policies. Accordingly, the City is liable for ongoing violations of the Act and the General Permi's Discharge Prohibitions for each day of significant rainfall since at least May 6, 2021. Civil penalties and injunctive relief are available remedies for these violations. 33 U.S.C. §§ 1311, 1342. LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

**D.  Total Maximum Daily Load Requirements**

The Facilities' Receiving Waters are listed (or proposed for listing) on the State Board's 303(d) list of impaired water bodies for, among other pollutants, nitrate, nitrite, cadmium, copper, lead, and zinc. The State Board has amended the General Permit to incorporate TMDL-specific requirements translated from the Los Angeles River Metals TMDL and the Los Angeles River Nitrogen TMDL. As evidenced by sampling LA Waterkeeper conducted on March 5, 2025, BMPs designed and implemented by the Facilities are insufficient to prevent exceedances of

NELs. On that basis, the City has been and will remain in ongoing violation of the General Permit's TMDL requirements until there is no reasonable likelihood that it will repeat these violations. LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

### E. Storm Water Pollution Prevention Plan

1. Asphalt Plant 1

Based on LA Waterkeeper's review of all documents publicly available via SMARTS, including without limitation four (4) SWPPPs certified between 2020 and 2025, the City has conducted and continues to conduct operations at Plant 1 without an adequately developed, implemented and/or revised SWPPP.

The majority of the text in each of the SWPPPs is bulk recitations of General Permit requirements. Information specific to Plant 1 is largely cursory, incomplete, and often internally inconsistent. Sections in Plant 1's publicly available SWPPPs that are patently deficient include, without limitation:

- The Plant 1 SWPPPs fail to adequately describe numerous pollutant sources associated with the asphalt production process, including without limitation, dust and particulate generating sources. Plant 1's SWPPPs also fail to include elements required for a lawful pollutant source assessment, including without limitation the identification of pollutants found in aggregate (*e.g.*, benzene and metals) and vehicle and equipment fueling (*e.g.*, fuel additives, lubricants, heavy metals) (*see* General Permit § X.G.1-2);
- A list of materials handled at the facility, the typical quantities and handling frequency of these industrial materials, and the locations where each material is stored, received, shipped, and handled (General Permit, § X.F.a-d);
- A list of any industrial materials that have spilled or leaked from the facility's storm water conveyance system within the previous five-year period including, among other requirements, the location, characteristics, and approximate quantity of the materials leaked (General Permit, § X.G.1.d); and
- The Plant 1 SWPPPs fail to provide essential information necessary for effective BMP implementation, including but not limited to: the individual and/or position responsible for implementing the BMP; the procedures to implement the BMP effectively; the equipment and tools necessary to implement the BMP effectively; and the BMPs that may require more frequent visual observations beyond monthly visual observations. (General Permit, § X.H.4)

2. Asphalt Plant 2

Based on LA Waterkeeper's review of all documents publicly available via SMARTS, including without limitation four (4) SWPPPs certified between 2020 and 2025, the City has conducted and continues to conduct operations at Plant 2 without an adequately developed, implemented and/or revised SWPPP.

The majority of the text in each of the SWPPPs is bulk recitations of General Permit requirements. Information specific to Plant 2 is largely cursory, incomplete, and often internally inconsistent. Sections in Plant 2's publicly available SWPPPs that are patently deficient include, without limitation:

- Pollution Source Description and Assessment (*see* General Permit § X.G.1-2): the Plant 2 SWPPPs fail to adequately describe numerous pollutant sources associated with the asphalt production process, including without limitation, dust and particulate generating sources, and contain virtually no assessment of pollutant sources including without limitation the identification of pollutants found in aggregate (*e.g.*, benzene and metals) and vehicle and equipment fueling (*e.g.*, fuel additives, lubricants, heavy metals);
- A clear, legible site map with demarcated drainage areas, locations and descriptions of structural control measures, and  locations where significant spills or leaks have occurred (General Permit, § X.E);
- A list of materials handled at the facility, the typical quantities and handling frequency of these industrial materials, and the locations where each material is stored, received, shipped, and handled (General Permit, § X.F.a-d);
- A list of any industrial materials that have spilled or leaked from the facility's storm water conveyance system within the previous five-year period including, among other requirements, the location, characteristics, and approximate quantity of the materials leaked (General Permit, § X.G.1.d); and
- The Plant 2 SWPPPs fail to provide essential information necessary for effective BMP implementation, including but not limited to: the individual and/or position responsible for implementing the BMP; the procedures to implement the BMP effectively; the equipment and tools necessary to implement the BMP effectively; and the BMPs that may require more frequent visual observations beyond monthly visual observations. (General Permit, § X.H.4)

### 3. Recycled Aggregate Yard

The City has not prepared and filed a SWPPP on SMARTS for the Recycled Aggregate Yard. Every day that the City operates the Recycled Aggregate Yard without a SWPPP (or an inadequately developed, implemented, and/or properly revised SWPPP) is a separate and distinct violation of the General Permit and Act.

The City has been in and remains in daily violation of the General Permit's SWPPP requirements since at least May 6, 2021. These violations are ongoing on LA Waterkeeper will include additional claims of violations in its enforcement action as information becomes available.

### F.  Monitoring Implementation Plan

The City has violated and continues to violate the General Permit's Monitoring Plan Requirements at Asphalt Plant 1, Asphalt Plant 2, and the Recycled Aggregate Yard. Documents publicly available via SMARTs reveal that the City has failed to collect, analyze, and report storm monitoring data as required by the General Permit between at least the 2019-2020

20

Reporting Year and the present.[9] *See* Attachment B. The City has only submitted three (3) total storm water samples over the course of the last five (5) Reporting Years for Plant 1, falling well short of the minimum required twenty (20) required samples. Similarly, only one (1) storm water sample has been submitted for Plant 2 over the course of the last five (5) Reporting Years. Further, none of these samples included analysis for all pollutants present at the Facilities (including but not limited to metals), as the City has only tested for the minimum parameters in the General Permit (TSS, pH, and Oil & Grease) at Plant 1 and Plant 2.

Relatedly, the City is in ongoing violation of the General Permit's Monitoring Plan provisions for failing to: a) collect storm water samples from all discharge points; b) analyze results for all pollutants required by the General Permit, including without limitation site-specific parameters (General Permit § XI.B.6.c) and TMDL-based parameters (General Permit § XI.B.6.e); and c) conduct and record visual observations of all areas of industrial activity and areas impacted by industrial operations (e.g., public and private areas adjacent to the site) (General Permit, § XI.B.4).

Because the Recycled Aggregate Yard is unpermitted, the City has not developed or implemented a Monitoring Plan for the Recycled Aggregate Yard, and has not collected or analyzed a single storm water sample during any Reporting Year.

Accordingly, the City has failed and continues to fail to adequately develop and implement a Monitoring Plan that complies with the General Permit. Every day the City operates the Recycled Aggregate Yard with an inadequately developed and implemented Monitoring Plan is a separate and distinct violation of the General Permit and the Act. The City has been in daily and continuous violation of the General Permit's Monitoring Plan requirements, and subject to civil penalties for all such violations since at least May 6, 2021. These violations are ongoing and LA Waterkeeper will include additional claims of violations in its enforcement action when information becomes available.

## G.  Annual Comprehensive Facility Compliance Evaluation

### 1.  Recycled Aggregate Yard

The City did not complete Annual Compliance Evaluations for the Recycled Aggregate Yard or submit an Annual Report for any Reporting Year. These violations occur annually and are ongoing, and LA Waterkeeper will include claims of additional violations in its enforcement action as information becomes available.

## IV.    RELEIF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the CWA subjects

---

[9] The City appears to have included 2023 storm water sampling results with 2025 Annual Report submitted to SMARTS and did not conduct any stormwater sampling in Reporting Year 2024-2025.

21

the violator to civil monetary penalties up to $66,712.00 for violations that occur or occurred after November 2, 2015, where penalties are assessed on or after December 27, 2023.

In addition to civil penalties, LA Waterkeeper will seek injunctive relief preventing further violations of the General Permit and Act pursuant to Sections 505(a) and 505(d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Act, 33 U.S.C. § 1365(d), LA Waterkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## V.   PERSONS RESPONSIBLE FOR THE VIOLATIONS

LA Waterkeeper puts the City on notice that it is the entity responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, LA Waterkeeper puts the City on notice that it intends to include those persons in this action.

## VI.   NAME AND ADDRESS OF NOTICING PARTY

The name, mailing address, and telephone number of the noticing party is:

Benjamin Harris; Erina Kwon
Los Angeles Waterkeeper
360 East 2nd Street, Suite 250
Los Angeles, California 90012
ben@lawaterkeeper.org; erina@lawaterkeeper.org
(310) 394-6162

LA Waterkeeper has retained legal counsel to represent it in this matter. Please direct all communications to:

Hannah Mathieson
Sycamore Law, Inc.
1004 O'Reilly Avenue
San Francisco, California 94129
hannah@sycamore.law

Jesse Swanhuyser
Sycamore Law, Inc.
1004 O'Reilly Avenue
San Francisco, California 94129
jesse@sycamore.law

//
//
//

22

## VII.    CONCLUSION

LA Waterkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. If you wish to pursue settlement discussions, please reach out to counsel at Sycamore Law, Inc. using the contact information above. I suggest that, if interested, those discussions be initiated soon, as upon expiration of the 60-day notice period, LA Waterkeeper intends to file a citizen suit under Section 505(a) of the Clean Water Act for LAStreet's violations of the General Permit and the Act at the Facilities. LA Waterkeeper does not intend to delay filing a complaint in federal court if discussions are continuing when the 60-day period ends.

Sincerely,

Hannah Mathieson
Sycamore Law, Inc.
1004 O'Reilly Ave.
San Francisco, 94129

Enclosures:
Attachment A: Qualifying Storm Events
Attachment B: Facilities' Sampling Records

23

**SERVICE LIST**

<u>VIA CERTIFIED U.S. MAIL</u>

Todd Blanche, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington D.C., 20530-001

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Ave., N.W.
Washington D.C., 20460

Mike Martucci, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne St.
San Francisco, California 94105

Eric Oppenheimer, Executive Director
State Water Resources Control Board
1001 I Street
Sacramento, California 95814

Susana Arredondo, Executive Officer
Los Angeles Regional Water Quality Control Board
320 West Fourth St., Suite 200
Los Angeles, CA 90013

**Attachment A**

**Rain Data from Downtown Los Angeles Weather Station**

| Date | Rain Volume |
| --- | --- |
| 11/07/2020* | 0.11 in. |
| 12/24/2020 | 0.02 in. |
| 12/27/2020 | 0.01 in. |
| 12/28/2020 | 1.81 in. |
| 01//23/2021* | 0.38 in. |
| 01/24/2021 | 0.07 in. |
| 01/25/2021 | 0.29 in. |
| 01/28/2021* | 0.98 in. |
| 01/29/2021* | 0.72 in. |
| 03/03/2021* | 0.16 in. |
| 03/10/2021* | 0.83 in. |
| 03/11/2021* | 0.12 in. |
| 03/15/2021* | 0.30 in. |
| 06/17/2021 | 0.02 in. |
| 07/13/2021* | 0.10 in. |
| 07/26/2021* | 0.12 in. |
| 09/10/2021 | 0.01 in. |
| 10/04/2021* | 0.10 in. |
| 10/05/2021 | 0.02 in. |
| 10/08/2021 | 0.01 in. |
| 10/18/2021 | 0.04 in. |
| 10/23/2021 | 0.05 in. |
| 10/25/2021 | 0.49 in. |
| 12/07/2021 | 0.01 in. |
| 12/09/2021* | 0.12 in. |
| 12/13/2021 | 0.03 in. |
| 12/14/2021* | 2.16 in. |
| 12/16/2021 | 0.03 in. |
| 12/23/2021* | 1.66 in. |
| 12/24/2021* | 0.29 in. |
| 12/25/2021* | 0.54 in. |
| 12/26/2021 | 0.07 in. |
| 12/27/2021* | 0.24 in. |
| 12/29/2021* | 1.74 in. |
| 12/30/2021* | 2.57 in. |
| 01/15/2022 | 0.01 in. |
| 01/17/2022* | 0.18 in. |
| 02/15/2022 | 0.06 in. |
| 03/05/2022 | 0.08 in. |
| 03/19/2022 | 0.01 in. |
| 03/28/2022* | 1.32 in. |
| 04/21/2022* | 0.28 in. |
| 04/22/2022 | 0.05 in. |
| 06/22/2022 | 0.01 in. |
| 09/09/2022* | 0.12 in. |
| 09/10/2022* | 0.24 in. |
| 09/11/2022 | 0.01 in. |

| Date | Amount |
|---|---|
| 10/15/2022 | 0.02 in. |
| 11/01/2022 | 0.01 in. |
| 11/02/2022* | 0.11 in |
| 11/07/2022* | 0.15 in. |
| 11/08/2022* | 1.71 in. |
| 12/02/2022* | 0.12 in. |
| 12/04/2022 | 0.02 in. |
| 12/11/2022* | 0.83 in. |
| 12/12/2022* | 0.26 in. |
| 12/27/2022* | 0.45 in. |
| 12/28/2022 | 0.01 in. |
| 12/30/2022 | 0.01 in. |
| 12/31/2022* | 1.11 in. |
| 01/01/2023 | 0.01 in. |
| 01/02/2023 | 0.03 in. |
| 01/03/2023 | 0.06 in. |
| 01/04/2023* | 0.46 in. |
| 01/05/2023* | 1.37 in. |
| 01/09/2023* | 2.04 in. |
| 01/10/2023* | 1.31 in. |
| 01/14/2023* | 1.82 in. |
| 01/15/2023* | 0.69 in. |
| 01/16/2023* | 0.41 in. |
| 01/29/2023* | 0.18 in. |
| 01/30/2023* | 0.57 in. |
| 02/05/2023 | 0.03 in. |
| 02/23/2023* | 0.12 in. |
| 02/24/2023* | 2.29 in. |
| 02/25/2023* | 2.08 in. |
| 02/26/2023 | 0.07 in. |
| 02/27/2023* | 0.42 in. |
| 02/28/2023* | 0.94 in. |
| 03/01/2023* | 0.27 in. |
| 03/05/2023 | 0.05 in. |
| 03/06/2023 | 0.01 in. |
| 03/10/2023* | 0.81 in. |
| 03/11/2023* | 0.12 in. |
| 03/14/2023* | 1.89 in. |
| 03/15/2023* | 1.22 in. |
| 03/19/2023* | 0.10 in. |
| 03/20/2023* | 0.13 in. |
| 03/21/2023* | 1.43 in. |
| 03/22/2023* | 0.33 in. |
| 03/23/2023 | 0.02 in. |
| 03/29/2023* | 0.92 in. |
| 03/30/2023* | 0.41 in. |
| 04/12/2023 | 0.01 in. |
| 04/13/2023 | 0.05 in. |
| 05/01/2023 | 0.04 in. |
| 05/03/2023 | 0.03 in. |
| 05/04/2023* | 0.47 in. |

| | |
|---|---|
| 05/23/2023 | 0.01 in. |
| 08/20/2023* | 2.48 in. |
| 08/21/2023* | 0.51 in. |
| 09/21/2023 | 0.03 in. |
| 09/30/2023 | 0.02 in. |
| 11/15/2023* | 0.34 in. |
| 11/18/2023 | 0.02 in. |
| 12/18/2023 | 0.02 in. |
| 12/19/2023* | 0.19 in. |
| 12/20/2023* | 0.41 in. |
| 12/21/2023* | 0.89 in. |
| 12/22/2023* | 0.58 in. |
| 12/30/2023* | 0.73 in. |
| 01/03/2024* | 0.22 in. |
| 01/20/2024* | 0.41 in. |
| 01/21/2024* | 1.37 in. |
| 01/25/2024 | 0.05 in. |
| 02/01/2024* | 1.54 in. |
| 02/03/2024* | 0.15 in. |
| 02/04/2024* | 4.10 in. |
| 02/05/2024* | 2.93 in. |
| 02/06/2024* | 1.48 in. |
| 02/07/2024* | 0.37 in. |
| 02/17/2024 | 0.01 in. |
| 02/18/2024 | 0.01 in. |
| 02/19/2024* | 1.05 in. |
| 02/20/2024* | 0.69 in. |
| 02/21/2024* | 0.23 in. |
| 02/26/2024* | 0.10 in. |
| 03/01/2024 | 0.07 in. |
| 03/02/2024* | 0.28 in. |
| 03/03/2024 | 0.03 in. |
| 03/06/2024* | 0.72 in. |
| 03/07/2024 | 0.01 in. |
| 03/23/2024* | 0.28 in. |
| 03/24/2024 | 0.01 in. |
| 03/29/2024* | 0.12 in. |
| 03/30/2024* | 1.73 in. |
| 03/31/2024* | 0.25 in. |
| 04/04/2024 | 0.01 in. |
| 04/05/2024 | 0.09 in. |
| 04/13/2024* | 0.36 in. |
| 04/14/2024* | 0.17 in. |
| 05/05/2024* | 0.13 in. |
| 11/02/2024* | 0.07 in. |
| 11/23/2024 | 0.02 in. |
| 11/24/2024 | 0.03 in. |
| 12/24/2024 | 0.02 in. |
| 01/25/2025* | 0.11 in. |
| 02/05/2025* | 0.24 in. |
| 02/06/2025* | 0.99 in. |

| | |
|---|---|
| 02/07/2025* | 0.71 in. |
| 02/12/2025 | 0.06 in. |
| 02/13/2025* | 2.80 in. |
| 02/14/2025 | 0.08 in. |
| 03/05/2025* | 0.53 in. |
| 03/06/2025 | 0.09 in. |
| 03/07/2025 | 0.01 in. |
| 03/11/2025 | 0.03 in. |
| 03/12/2025 | 0.31 in. |
| 03/13/2025* | 1.03 in. |
| 03/14/2025 | 0.04 in. |
| 03/17/2025 | 0.02 in. |
| 03/30/2025 | 0.07 in. |
| 03/31/2025 | 0.08 in. |
| 04/03/2025 | 0.09 in. |
| 04/26/2025* | 0.22 in. |
| 05/06/2025 | 0.03 in. |
| 06/03/2025 | 0.03 in. |
| 06/04/2025 | 0.01 in. |
| 09/17/2025 | 0.02 in. |
| 09/18/2025 | 0.07 in. |
| 10/14/2025* | 1.38 in. |
| 11/14/2025* | 0.83 in. |
| 11/15/2025* | 1.65 in. |
| 11/16/2025* | 0.25 in. |
| 11/17/2025* | 0.74 in. |
| 11/18/2025 | 0.01 in. |
| 11/20/2025* | 0.94 in. |
| 11/21/2025* | 1.11 in. |
| 12/23/2025 | 0.08 in. |
| 12/24/2025* | 2.58 in. |
| 12/25/2025* | 0.26 in. |
| 12/26/2025* | 1.35 in. |
| 12/31/2025* | 0.43 in. |
| 01/01/2026* | 1.31 in. |
| 01/02/2026* | 0.30 in. |
| 01/03/2026* | 0.54 in. |
| 01/04/2026* | 0.32 in. |
| 02/11/2026* | 0.75 in. |
| 02/16/2026* | 1.91 in. |
| 02/17/2026* | 0.30 in. |
| 02/18/2026* | 0.33 in. |
| 02/19/2026* | 0.96 in. |
| 03/31/2026* | 0.24 in. |
| 04/11/2026 | 0.02 in. |
| 04/12/2026* | 0.31 in. |

**Attachment B**

**Table 1: Asphalt Plant 1**

| Date | Pollutant | Result | Benchmark | NAL | CTR |
|---|---|---|---|---|---|
| | | **2024-2025** **Reporting Year** *[Sampling Events: Fall: 0, Spring: 0]* | | | |
| | | **2023-2024** **Reporting Year** *[Sampling Events: Fall: 1, Spring: 0]* | | | |
| 12.20.2023 | O&G | 20.2 mg/L | n/a | 15 mg/L | n/a |
| | TSS | 490 mg/L | 100 mg/L | 100 mg/L | n/a |
| | pH | 7.85 s.u. | 6.0-9.0 s.u. | 6.0-9.0 s.u. | n/a |
| | | **2022-2023** **Reporting Year** *[Sampling Events: Fall: 0, Spring: 2]* | | | |
| 01.05.2023 | O&G | 12 mg/L | n/a | 15 mg/L | n/a |
| | TSS | 368 mg/L | 100 mg/L | 100 mg/L | n/a |
| | pH | 7.19 s.u. | 6.0-9.0 s.u. | 6.0-9.0 s.u. | n/a |
| 03.29.2023 | O&G | ND | n/a | 15 mg/L | n/a |
| | TSS | 43 mg/L | 100 mg/L | 100 mg/L | n/a |
| | pH | 7.7 s.u. | 6.0-9.0 s.u. | 6.0-9.0 s.u. | n/a |
| | | **2021-2022** **Reporting Year** *[Sampling Events: Fall: 0, Spring: 0]* | | | |
| | | **2020-2021** **Reporting Year** *[Sampling Events: Fall: 0, Spring: 0]* | | | |

**Table 2: Asphalt Plant 2**

| Date | Pollutant | Result | Benchmark | NAL | CTR |
|---|---|---|---|---|---|
| | | | | | |
| | **2024-2025**<br>**Reporting Year**<br>*[Sampling Events: Fall: 0, Spring: 0]* | | | | |
| | **2023-2024**<br>**Reporting Year**<br>*[Sampling Events: Fall: 1, Spring: 0]* | | | | |
| 12.21.2023 | O&G | 5.3 mg/L | n/a | 15 mg/L | n/a |
| | TSS | 22.4 mg/L | 100 mg/L | 100 mg/L | n/a |
| | pH | 7.44 s.u. | 6.0-9.0 s.u. | 6.0-9.0 s.u. | n/a |
| | **2022-2023**<br>**Reporting Year**<br>*[Sampling Events: Fall: 0, Spring: 0]* | | | | |
| | **2021-2022**<br>**Reporting Year**<br>*[Sampling Events: Fall: 0, Spring: 0]* | | | | |
| | **2020-2021**<br>**Reporting Year**<br>*[Sampling Events: Fall: 0, Spring: 0]* | | | | |